United States District Court
Southern District of Texas
**ENTERED**
August 05, 2024
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| Mostafa Hassan Natour, § | |
| *Plaintiff*, § | |
| § | |
| v. § | Civil Action No. H-23-234 |
| § | |
| United States of America, § | |
| *Defendant*. § | |

## MEMORANDUM AND ORDER

This case has been referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1). Pending before the court is Defendant's Motion to Exclude Plaintiff's Retained Expert Dr. Alex Cruz, ECF No. 61. The motion to exclude is **GRANTED**.

### 1. *Factual Background*

Mostafa Natour was injured in a car accident with a United States Postal Services delivery truck. ECF No. 1 at 3. Natour received medical treatment that consisted of imaging studies, chiropractic care, epidural injections, and pain management care. ECF No. 61-2 at 5 (Cruz's expert report); ECF No.1 at 5 (Natour's complaint). Natour seeks to recover, among other things, his past medical expenses. ECF No. 1 at 5.

Natour retained Alex Cruz, M.D. of Abacus Analytics as an expert on causation as well as the reasonableness and necessity of Natour's medical expenses. ECF No. 61-2 at 3. Dr. Cruz is licensed to practice medicine in the State of Texas and has extensive training and experience with patient care, surgery, and medical billing. *Id.* at 4. In his expert report, Dr. Cruz opined that "based upon [his] education, training and professional experience . . . the usual, customary and reasonable value of [Natour's] medical care is $50,533.00." *Id.* at 5–6. He explained that he used "industry

standard databases including Context4Healthcare, Physicians Fee Schedule, FindACode, and American Health Directory" to determine that figure. ECF No. 61-2. Dr. Cruz explained as follows during his deposition:

> Q: And . . . your report . . . says that you used these industry standard databases . . . How did you determine to use this database?
>
> A: That was provided to me through Abacus. Again, these are industry standards. We end up using a multitude of different resources to gather a range of data as opposed to just an average for just a single digit number. Generally, we want to get a range of UCR[1] values.
>
> Q: So does Abacus Analytics require you to use the databases in your report?
>
> A: They don't require it. It is provided as a resource, however.
>
> Q: And were you provided any other databases to review?
>
> A: No.
>
> Q: As resources?
>
> A: No.

ECF No. 61-3 at 7.

Dr. Cruz was unable to explain how the data from the various databases was aggregated within the Abacus Analytics database:

> Q: Okay. So on your report, you list four databases. So how did you go about aggregating all the data from all these four databases?

---

[1] Dr. Cruz uses "UCR" to refer to "usual, customary, and reasonable" medical expenses. ECF No. 61-3 at 8.

> A: Generally, you – with the website – on the Abacus website, you're able to find certain CPT codes,[2] and it gives you a range for these UCR values dependent on whatever the CPT code is. And it pulls and gathers the data from these resources that are available to us.
>
> . . .
>
> Q. But you're not aware of how [the Abacus Analytics website] aggregates all that information from those databases?
>
> A. No, ma'am.

ECF No. 61-3 at 7–8, 29.

Dr. Cruz was unable to explain the contents of or the differences between the various databases that the Abacus Analytic website uses. Nor could he directly view the data within each database:

> Q: Okay. So the Physician Fee Schedule [database] . . . is that from the American Medical Association?
>
> A: I'm not familiar. I'm not sure.
>
> Q: So what are the differences between all four of the[] databases [mentioned in your report]?
>
> A: You know, I don't know the differences in particular. And if you go into one website versus another, this is all kind of pulled together, and it generates information as an aggregate.

---

[2] Current Procedural Terminology, or CPT, codes are standardized five-digit codes used to code procedures for medical records, insurance claims, and statistical purposes. The CPT coding system is the preferred system for coding and describing healthcare services and procedures in federal programs and by private insurers and healthcare providers. Peggy Dotson, *CPT Codes: What Are They, Why Are They Necessary, and How Are They Developed?*, NAT'L LIBR. OF MED., https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3865623/#:~:text=Category%20I%20CPT%20codes%20describe,to%20as%20performance%20measurement%20codes (last visited August 3, 2024).

> Q: So is there a database or website that does the – that aggregates all the data from these databases?
>
> A: Yeah. Again, that's based on the Abacus Analytics website. You're able to look into – not the individual resources, but you're able to pull in – put in a CPT code, for example, and it'll give you range of data for you to make a decision as to what is UCR.
>
> Q: So once you receive that range of data from Abacus Analytics' website, how did you determine which number to use for the UCR?
>
> A: That is just based on whatever the UCR value is from the website.
>
> Q: So the website determines the UCR value?
>
> A: It gives us a range, yeah. So generally it will give you a range and say, okay, this is it, or sometimes it will give you a set standard as to what is the actual zip code.

ECF No. 61-3 at 8–9.

Dr. Cruz testified that he did not utilize his own personal knowledge and experience when determining the reasonable cost of Natour's medical care. Dr. Cruz instead relied solely upon the value generated by the Abacus Analytics website:

> Q: Can you give me an example of what a [UCR] range would look like?
>
> A: Generally, [the Abacus Analytics website] would say . . . what is standard for that zip code. *I just base it on what the information that comes up to me on that website. . . .* That's generally what the information – I get from the website.
>
> Q: *And do you use your judgment based on your own experience with billing in terms of determining the UCR or is it just based on what the website says?*
>
> A: *Based on what the website says. I try not to inject my own bias.*

4

> Q: Do you know whether the – this website that Abacus Analytics – that you used for this report bases anything on the Medicare guidelines?
>
> A: I do not know.
>
> Q: Do you know any other information that Abacus Analytics uses to create this aggregate data that you used in this report?
>
> A: No ma'am.
>
> Q: So can you describe to me, what was your process? If you have a CPT code for a treatment that Mr. Natour received, what would you do with that information to determine the UCR?
>
> A: You type in[to the Abacus Analytics website] – okay, well, you know, this is a CPT 633814, I don't know, I'm making that up. *And then [the website will] pull up whatever the value is for that zip code for the UCR, and then that's essentially what I put in.*
>
> Q: And then it spits out a number and that's what you use to compare to what he was billed?
>
> A: Yes.

ECF No. 61-3 at 9–10, 12, 13–14 (emphasis added).

An example of Dr. Cruz's disregard of his own professional experience is his testimony about the cost of an MRI:

> Q: You broke down the cost for the MRI. And did you find the cost -- so to confirm, [Natour] was charged – or he was billed [$]3,800 for each MRI, and you found that this was uniform, customary, and reasonable. Correct?
>
> . . .
>
> A: Correct. Right. So you look at the – the charges based on the billing records. You apply that CPT code onto the website that we aforementioned, and then that is the UCR value that was provided.

5

Q: So it's fair to say that that website – the number that came out when you entered the CPT code, the website said [$]3,800 was UCR?

A: Yes ma'am.

. . .

Q: And in your own experience . . . do you have any experience for what a[n] MRI typically cost with your patients?

A: The self-pay – for patients that are uninsured or prefer not to pay through insurance is about $500.

. . .

Q: Do you have any – do you know why, in this case, the UCR for an MRI would be [$]3,800?

A: No.

Q: So just to confirm, on the MRIs is it your conclusion that the cost for each MRI was reasonable?

A: Based on the information that was given to me [via the Abacus Analytics website] for the zip code, yes.

. . .

Q: Are you able to make your own determination as to what the UCR is?

*A: I don't like to inject bias into this. . . . I don't want to give, you know, whatever I think is correct in terms of charges based on my own experiences. I rather have it from some objective source as opposed to me being subjective information for you.*

Q: And that objective source is only what Abacus has provided you?

A: Yes, ma'am.

. . .

Q: And to confirm, does Abacus Analytics allow you to stray from their UCR?

A: I haven't approached that topic before, and I never had that issue.

6

> Q: So you've never – you've never tried to – or put in your own determination as to what the UCR is?
>
> A: Right.
>
> Q: Okay. And based on all the treatment that Mr. Natour received, you don't have experience on what those charges are in your own practice?
>
> A: Not for the pain management procedures, no.
>
> . . .
>
> Q: [And] you didn't use any of [your experience with rates paid by various private insurers] to provide your report in this case?
>
> A: No ma'am.

ECF No. 61-3 at 17–20, 29–32, 37 (emphasis added).

The Government argues that Dr. Cruz's testimony about the reasonableness of Natour's medical expenses should be excluded because: (1) Dr. Cruz did not employ valid reasoning or methodology and thus offers an unreliable opinion; and (2) Dr. Cruz is unqualified. ECF No. 61. Because Dr. Cruz's opinions are unreliable, the court need not reach Dr. Cruz's qualifications.

### 2. *Legal Standard*

The Federal Rules of Evidence require that a witness be "qualified as an expert by knowledge, skill, experience, training, or education" to provide expert testimony. Fed. R. Evid. 702. A qualified expert witness may testify if the proponent demonstrates that it is more likely than not that: (1) his scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Fed. R. Evid. 702(a)–(d).

7

The facts and data on which an expert relies may include information that the expert did not personally gather, including the opinions of other experts. Fed. R. Evid. 702 Advisory Comm.'s Notes to 2000 Amendments ("The term 'data' is intended to encompass the reliable opinions of other experts."); *see also* Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); *Earnest v. Sanofi U.S. Servs. (In re Taxotere (Docetaxel) Prods. Liab. Litig.)*, 26 F.4th 256, 269 n.10 (5th Cir. 2022) ("[W]e likewise do not conclude that an expert may not rely on another expert's (or a lay witness's) admissible testimony."). That being said, the facts on which the expert relies must be reliable. *Loy v. Rehab Synergies, LLC*, 558 F. Supp. 3d 402, 415 (S.D. Tex. 2021) (excluding expert witness testimony because a spreadsheet used to calculate damages was based on unreliable facts).

In the context of medical billing, courts have held that an expert's testimony about the reasonableness of medical expenses may be admitted when the expert utilized reliable databases and explained the methodology for determining the value of the medical care provided. *See Cornejo v. EMJB, INC*, SA-19-CV-01265-ESC, 2021 WL 4526703, at *11 (W.D. Tex. Oct. 04, 2021) (finding that the expert's methodology was reliable when the expert "compared data on the amounts paid by Medicare and private insurers to physicians in his 1,500 physician group for the same procedures and treatment received by or recommended to Plaintiffs in the future."); *Grant v. CRST Expedited, Inc.*, No. 1:18-CV-433, 2021 WL 1151560, at *11 (E.D. Tex. Jan. 28, 2021) ("[the expert] relied on his education, knowledge, training, and experience . . . [and] utilized: (1) his . . . experience in the usual and customary reimbursement for medical and surgical services provided to [his] patients . . . (2) published reimbursement data by

8

Medicare and by major private healthcare insurance companies . . . (3) cash pay prices . . . in the State of Texas; . . . and (5) billing and reimbursement data obtained from peer reviewed medical literature . . . [to] compare[] the costs charged by [the plaintiff's] medical providers with the cost for each service as determined by his sources."); *Perez v. Boecken*, SA-19-CV-00375-XR, 2020 WL 307440, at *10 (W.D. Tex. June 10, 2021).

### 3. *Analysis*

Dr. Cruz's methodology for determining the reasonable cost of Natour's medical expenses was very simple: he typed in the CPT code and zip code, and the database generated a range of values. He then used that output in his report. He does not know how the figure was determined. He does not know anything about the underlying data. He disregarded his own experience, even when it conflicted with the information that the database was giving him. He cannot explain how the Abacus Analytics website determines the "UCR" value of medical services. At his deposition, he did not "recall how it's done" or know how the website aggregated the data from the various "industry standard databases." ECF No. 61-3 at 7, 29. Dr. Cruz did not know much about the data within the industry standard databases or the differences between them. *Id.* at 8.

Dr. Cruz stated that his opinions relied on the Abacus Analytics website because he would "rather have [the UCR values] from an objective source" and did not "want to give . . . whatever [he thought was] correct . . . based on [his] own experiences." ECF No. 61-3 at 29. Dr. Cruz stated that he never tried to make his own determination as to what the usual, customary and reasonable value was. *Id.* at 31–32. Dr. Cruz did not compare Natour's charges to the amounts Dr. Cruz charges in his own medical practice or the amounts paid by the various private insurers with whom he works.

9

The court concludes that Dr. Cruz's expert opinions are not based on reliable data and are not the product of reliable principles and methods. Dr. Cruz's opinions are therefore not admissible and will be excluded.

### *4. Conclusion*

For the foregoing reasons, Defendant's Motion to Exclude Plaintiff's Retained Expert Dr. Alex Cruz, ECF No. 61, is **GRANTED**.

Signed at Houston, Texas on August 5, 2024.

_____
Peter Bray
United States Magistrate Judge